**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

UNITED STATES OF AMERICA

Plaintiff,

v.

AMEREN CORPORATION; BARRY ELECTRIC COOPERATIVE; BARTON COUNTY ELECTRIC; CHEVRON ENVIRONMENTAL MANAGEMENT COMPANY; CITIZENS ELECTRIC CORPORATION; CITY OF CABOOL, MISSOURI; CITY OF FREDERICKTOWN, MISSOURI D/B/A FREDERICKTOWN LIGHT & POWER; CITY OF JACKSON, MISSOURI; E.I. DU PONT NEMOURS AND COMPANY (N/K/A EDIP, INC.); EEMSCO (A/K/A EVANSVILLE ELECTRIC & MANUFACTURING CO., INC.); FARMERS ELECTRIC COOPERATIVE; FLORIDA POWER CORPORATION (N/K/A DUKE ENERGY FLORIDA, LLC); FREEMAN UNITED COAL MINING CO.; FRONTIER COMMUNICATIONS PARENT, INC.; HANCOCK RURAL TELEPHONE CORPORATION D/B/A NINESTAR CONNECT; KAGMO ELECTRIC; LINDE INC.; MALLINCKRODT US HOLDINGS LLC; MARATHON PETROLEUM COMPANY LP; MENARD ELECTRIC COOPERATIVE; MISSISSIPPI LIME COMPANY; MJM ELECTRIC COOPERATIVE; NATIONAL GRID USA SERVICE COMPANY; NESTLE PURINA PETCARE; NEW-MAC ELECTRIC COOPERATIVE; PEMISCOT-DUNKLIN ELECTRIC COOPERATIVE; RICHARDS ELECTRIC MOTOR CO.; SACHS ELECTRIC COMPANY D/B/A ARCHKEY SOLUTIONS; SIEMENS INDUSTRY, INC.; SIKESTON BOARD OF MUNICIPAL UTILITIES; SOUTH CENTRAL INDIANA REMC D/B/A SCI REMC; SOUTHERN ILLINOIS ELECTRIC COOPERATIVE; SPECTRUM BRANDS, INC.; THE DOE RUN RESOURCES COMPANY, INC. D/B/A THE DOE RUN COMPANY; WAYNE-WHITE COUNTIES ELECTRIC COOPERATIVE; and WHITEWATER VALLEY REMC

Defendants.

Case No. 4:24-cv-00371

**COMPLAINT**

The United States of America, by the of the Attorney General of the United States, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

NATURE OF THE ACTION

1. This is a civil action brought against the above-captioned Defendants ("Defendants"[1]) pursuant to Sections 106, 107(a), and 113(g) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9606, 9607(a), and 9613(g), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"). The United States seeks the recovery of its unreimbursed response costs incurred in connection with the Missouri Electric Works Superfund Site in Cape Girardeau, Missouri (the "Site"). The United States also seeks a declaratory judgment pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), holding Defendants liable for all future response costs that will be binding in any subsequent action or actions to recover further response costs incurred by the United States at or in connection with the Site.

JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action and over Defendants under 28 U.S.C. §§ 1331 and 1345 and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b).

3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the relevant releases or threatened releases of hazardous substances occurred within this district.

[1] As used herein, the term "Defendants" includes both the named defendants and any entity to which any of the named defendants is a successor with respect to the Site.

DEFENDANTS

4. Defendant Ameren Corporation is a corporation organized under the laws of the State of Illinois and, for all purposes relevant to this Complaint, is the successor to the Union Electric Company of St. Louis, the Missouri Utilities Company, and the Central Illinois Public Services Company.

5. Defendant Barry Electric Cooperative is a Missouri cooperative organized pursuant to the Rural Electric Cooperative Law of the State of Missouri.

6. Defendant Barton County Electric Cooperative is a Missouri cooperative organized pursuant to the Rural Electric Cooperative Law of the State of Missouri.

7. Defendant Chevron Environmental Management Company is a corporation organized under the laws of the State of Delaware and, for all purposes relevant to this Complaint, is the successor to Pittsburgh & Midway Coal Mining Co. and Chevron Mining, Inc.

8. Defendant Citizens Electric Corporation is a corporation organized under the laws of the State of Missouri.

9. Defendant City of Cabool, Missouri is a city organized and existing pursuant to the State of Missouri.

10. Defendant City of Fredericktown, Missouri is a city organized and existing pursuant to the laws of the State of Missouri. Fredericktown City Light & Power is a public utility operated by the City of Fredericktown.

11. Defendant City of Jackson, Missouri is a city organized and existing pursuant to the laws of the State of Missouri.

12. Defendant Florida Power Corporation is a limited liability corporation organized under the laws of the State of Florida and is now known as Duke Energy Florida, LLC.

13. Defendant E.I. du Pont de Nemours and Co., also known as EDIP, Inc., is a corporation organized under the laws of the State of Delaware.

14. Defendant EEMSCO, Inc. (a/k/a Evansville Electric & Manufacturing Co., Inc.) is a corporation organized under the laws of the State of Indiana.

15. Defendant Farmers' Electric Cooperative, Inc. is a Missouri Cooperative organized pursuant to the Rural Electric Cooperative Law of the State of Missouri.

16. Defendant Freeman United Coal Company is a corporation organized under the laws of the State of Illinois.

17. Defendant Frontier Communications Parent, Inc. is a corporation organized under the laws of the State of Delaware and, for all purposes relevant to this Complaint, is the successor to Citizens Utilities Company.

18. Defendant Hancock Rural Telephone Corporation d/b/a Ninestar Connect (f/k/a Hancock County REMC) is a rural electric membership cooperative organized pursuant to the Indiana Rural Electric Membership Corporation Act of the State of Indiana.

19. Defendant KAGMO Electric is a corporation organized under the laws of the State of Missouri.

20. Defendant Linde, Inc. is a corporation organized under the laws of the State of Delaware and, for all purposes relevant to this Complaint, is the successor to The BOC Group, Inc., a corporation formerly organized under the laws of the State of Delaware.

21. Defendant Mallinckrodt US Holdings, LLC is a limited liability company organized under the laws of the State of Delaware and, for all purposes relevant to this Complaint, is the successor to Mallinckrodt Group, Inc.

22. Defendant Marathon Petroleum Company LP is a corporation organized under the laws of the State of Delaware and, for all purposes relevant to this Complaint, is the successor to Marathon Oil Company, a corporation formerly organized under the laws of the State of Ohio.

23. Defendant Menard Electric Cooperative is a not-for-profit corporation organized pursuant to the laws of the State of Illinois.

24. Defendant Mississippi Lime Company is a corporation organized under the laws of the State of Missouri.

25. Defendant MJM Electric Cooperative is a not-for-profit corporation organized pursuant to the laws of the State of Illinois.

26. Defendant National Grid USA Service Company, Inc. (f/k/a New England Power Service Company) is a corporation organized under the laws of the Commonwealth of Massachusetts.

27. Defendant New-Mac Electric Cooperative, Inc. is a Missouri Cooperative organized pursuant to the Rural Electric Cooperative Law of the State of Missouri.

28. Defendant Pemiscot-Dunklin Electric Cooperative is a Missouri Cooperative organized pursuant to the Rural Electric Cooperative Law of the State of Missouri.

29. Defendant Nestle Purina Petcare is a corporation organized under the laws of the State of Missouri and, for all purposes relevant to this Complaint, is the successor to the Ralston Purina Company.

30. Defendant Richards Electric Motor Co. is a corporation organized under the laws of the State of Illinois.

31. Defendant Sachs Electric Company d/b/a Archkey Solutions is a corporation organized under the laws of the State of Missouri.

32. Defendant Siemens Industry, Inc. is a corporation organized under the laws of the State of Delaware and, for all purposes relevant to this Complaint, is the successor to Siemens Energy & Automation, Inc., a corporation formerly organized under the laws of the State of Delaware.

33. Defendant Sikeston Board of Municipal Utilities is a board of the City of Sikeston, a city organized and existing pursuant to the laws of the State of Missouri.

34. Defendant South Central Indiana REMC d/b/a SCI REMC (f/k/a Morgan County REMC) is a rural electric cooperative formed pursuant to the Indiana Rural Electric Membership Corporation Act.

35. Defendant Southern Illinois Electric Cooperative is a not-for-profit cooperative organized pursuant to the laws of the State of Illinois.

36. Defendant Spectrum Brands, Inc. is a corporation organized under the laws of the State of Delaware and, for all purposes relevant to this Complaint, is the successor to Salton/Toastmaster, Inc.

37. Defendant The Doe Run Resources Company, Inc. d/b/a The Doe Run Company is a corporation organized under the laws of the State of New York and is the successor to St. Joe Minerals Corporation (formerly a corporation organized under the laws of the State of New York).

38. Defendant Wayne-White Counties Electric Cooperative is a not-for-profit corporation organized pursuant to the laws of the State of Illinois.

39. Defendant Whitewater Valley REMC (f/k/a Wayne County REMC) is a rural electric membership cooperative formed pursuant to the Indiana Rural Electric Membership Corporation Act.

## STATUTORY FRAMEWORK

40. CERCLA was enacted in 1980 to provide a comprehensive governmental mechanism for abating releases and threatened releases of hazardous substances and other pollutants and contaminants and for funding the costs of such abatement and related enforcement activities, which are known as "response actions." 42 U.S.C. §§ 9604(a), 9601(25).

41. Under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1):

> Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment. When the President determines that such action will be done properly and promptly by the owner or operator of the facility or vessel or by any other responsible party, the President may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study in accordance with section 9622 of this title.

42. For CERCLA response actions and enforcement purposes, the Administrator of EPA is the President's delegate, as provided in operative Executive Orders.

43. Under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a):

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, . . .
>
> shall be liable for—

  (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan . . . .

44. Under Section 106 of CERCLA, 42 U.S.C. § 9606, the United States may commence a civil action or EPA may issue an order requiring the abatement of an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility.

45. Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provide that, in any action by the United States to recover its response costs under CERCLA Section 107, 42 U.S.C. § 9607 "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

## THE SITE

46. The Site is located in Cape Girardeau, Missouri. It occupies approximately 6.4 acres in a predominately commercial/industrial area, and comprises the former property of Missouri Electric Works, Inc. ("MEW"), as well as downgradient wetlands and other property where hazardous substances have come to be located.

47. From approximately August 1, 1954 until 1992, MEW received transformers and other electrical equipment for salvage and repair from a large number of utility companies, municipalities, and businesses, including Defendants, at its facility located on what is now the Site. MEW also purchased some transformers for resale.

48. Electrical transformers' operating components, primarily copper windings and coils, are submerged within insulating oil inside a sealed tank. Many transformers built before 1977 used insulating oil that contained Polychlorinated Biphenyls ("PCBs"), a listed hazardous

substance under CERCLA, at varying concentrations that generally exceeded 50 parts per million ("ppm").

49. MEW's operations resulted in the contamination of the Site with high levels of PCBs and other hazardous substances.

50. In 1984, the Missouri Department of Natural Resources inspected the Site and found more than one hundred 55-gallon drums containing PCB-contaminated oil. MEW had used the drums to store PCB-contaminated oil drained from transformers and other electrical equipment that had been sent to the Site. Many of these drums were leaking, while other empty drums containing PCB-contaminated residues were scattered around the Site.

51. From 1985 to 1990, EPA undertook removal and investigative actions at the Site pursuant to Sections 104(a) and (b) of CERCLA, 42 U.S.C. § 9604(a) and (b), to define the nature and extent of contamination and to control further migration of hazardous substances from the Site. Some potentially responsible parties ("PRPs") undertook additional investigations at the Site under the oversight of EPA.

52. These investigations provided additional information regarding the extent of PCB contamination in the soils at the Site and revealed the presences of volatile organic compounds and PCB contamination in the groundwater at the Site.

53. EPA determined that over 70% of the Site's surface soil was contaminated with PCBs at concentrations exceeding 10 ppm. Four acres of contaminated surface soil contained PCB concentrations of at least 500 ppm. The PCB concentration in the soil at the Site was determined to be as high as 58,000 ppm.

54. The Site was listed on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, on February 21, 1990. EPA has administratively divided the Site into three Operable Units for purposes of developing and implementing remedial actions.

55. EPA issued a Record of Decision ("ROD") pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, selecting a remedial action for what became Operable Unit 1 ("OU-1") of the Site (at the time, EPA had not yet designated additional operable units), which comprises Site soils, on September 28, 1990.

56. From 2000 to 2005, EPA and several PRPs (including Defendants) conducted investigations of the groundwater beneath the Site, which comprises Operable Unit 2 ("OU-2"). These studies revealed that the groundwater was contaminated with PCBs and hazardous organic compounds including known carcinogens at levels far exceeding human-health risk-based standards. In particular, EPA found levels of PCBs (in the form of Arocholor-1260) as high as 220 times greater than levels set forth as Maximum Concentration Levels for groundwater in various state and federal statutes.

57. EPA issued a ROD selecting a remedial action for OU-2 on September 28, 2005. The remedy selected two different response actions for the two groundwater regimes involved (fractured bedrock and the alluvium), including a contingent "monitored natural attenuation" remedy for the alluvium based on further study. The fractured bedrock remedy includes institutional controls, wellhead treatment, and long-term groundwater monitoring. Ultimately, EPA formally selected the contingent remedy for the alluvium in June 2015.

58. From September 2016 until approximately 2018, certain PRPs (including Defendants) conducted remedial investigations of Operable Unit 3 ("OU-3"), comprising areas of the Site potentially affected by surface water flows downgradient of the MEW facility.

59. EPA issued a ROD selecting the "no action alternative" as the remedial action for OU-3 of the Site on September 7, 2018.

60. EPA has incurred approximately $5.3 million in unreimbursed response costs in connection with the Site for OU-2; OU-3; certain sitewide costs that EPA, for accounting purposes only, assigns to an Operable Unit 00; and certain unreimbursed response costs for response actions in connection with OU-1 that were excluded from the OU-1 Consent Decree described below in Paragraphs 62 through 65 See infra ¶¶ 62–65.

61. The selected remedies at the Site include long-term monitoring, operations, and maintenance, and periodic reviews of the remedies' protectiveness. EPA will incur response costs in the future for these and other aspects of the selected remedies.

PRIOR SETTLEMENTS AT THE SITE

62. In approximately 1988, a group of about 70 PRPs formed a PRP group called the Missouri Electric Works Steering Committee ("MEWSC"). The MEWSC and other defendants performed the Remedial Investigation & Feasibility Study ("RI/FS") for OU-1 under an administrative agreement with EPA from December 1988 to September 1990. The United States and the MEWSC subsequently negotiated for the performance and funding of the selected remedy for OU-1.

63. In 1992, after extensive negotiations with the MEWSC, the United States and approximately 180 PRPs, including Defendants, reached a settlement to resolve the PRPs' liability for performance of the selected remedy for OU-1 of the Site. The settlement provided for three classes of PRPs: (1) the Settling Defendants, who agreed to perform the OU-1 remedy and conduct investigations of groundwater and pay certain then-future EPA response costs for oversight of the remedial work the PRPs would perform; (2) Soil De Minimis Settling

Defendants, de minimis parties who agreed to pay their share of the estimated costs of the OU-1 remedy and groundwater investigations and certain future costs; and (3) Soil and Groundwater De Minimis Settling Defendants, de minimis parties who agreed to pay their share of the estimated costs of the OU-1 and (future) OU-2 remedy and future costs. Defendants were among the Settling Defendants.

64. In June 1992, the United States filed a Civil Action asserting claims for cost recovery and injunctive relief related to OU-1 against the settling PRPs, including Defendants, simultaneously with a Consent Decree for the District Court's approval (the "OU-1 Consent Decree"). The Court approved the OU-1 Consent Decree in August 1994 after considering the objections of certain non-settling PRPs who intervened to oppose entry. The Eighth Circuit vacated and remanded for further proceedings in August 1996. After the District Court again approved the OU-1 Consent Decree in August 1996, the Eighth Circuit ultimately affirmed entry of the OU-1 Consent Decree, which was entered in March 1998.

65. Pursuant to the OU-1 Consent Decree, the Settling Defendants funded and conducted the selected response action for OU-1, which they completed in 2011, as well as the RI/FS for OU-2, which they completed in 2005.

66. The OU-1 Consent Decree provided a covenant not to sue to the members of the MEWSC from the United States and the State of Missouri only for "the Work," meaning, "all activities the Settling Defendants are required to perform pursuant to this Consent Decree." OU-1 Consent Decree ¶¶ 4 (definition of "Work"), 85 ("Covenants Not to Sue by U.S. and the State"). The "Work" included payments only for costs incurred by EPA after September 30, 1990 in overseeing the conduct of the remedy and implementation and enforcement of the Consent Decree. See id. ¶¶ 4, (definition of "Future Response Costs"), 5(a) ("Commitments by

Settling Defendants"), 55 ("Reimbursement of Response Costs"). The United States specifically reserved, inter alia, "Past Response Costs" (those incurred prior to September 30, 1996) and "Liability for costs that the United States, on behalf of EPA, and the State will incur related to the Site but which are not within the definition of Future Response Costs." Id. ¶¶ 4 (definition of "Past Response Costs"), 89 ("General Reservations of Rights").

67. The United States has also reached settlements since 1984 with a variety of other parties, including MEW itself and Soil De Minimis Settling Defendants. At this point, the only parties who have not resolved their liability to the United States for the entire Site are the members of the MEWSC or parties that are insolvent, nonviable, or otherwise defunct.

68. Each Defendant is a member of the MEWSC.

GENERAL ALLEGATIONS

69. Hazardous substances, including PCBs, were released at the Site as a result of MEW's transformer repair and scrapping operations.

70. Between August 1, 1954 and the early 1980s, Defendants (and others) sent thousands of transformers to the MEW facility for purposes of scrapping/salvage, repair, or refurbishment/resale. MEW and its customers, including Defendants, classified transformers in part by their rated voltage (volts) and current (amperes) capacity, multiplying the two together to derive a single figure representing a transformer's power in terms of kilovolts x amps, or "KVA."

71. Many transformers that Defendants sent to the MEW facility contained PCBs in their insulating oil, frequently at concentrations greater than 50 ppm.

72. Defendants retained ownership over each transformer they sent to MEW for repair before, during, and after the time that MEW conducted the repairs.

73. Defendants did not retain ownership over transformers they conveyed to MEW for scrapping/salvage, which they and/or MEW generally referred to as "J," "Junk," or "Junked" transformers (collectively, "Junk" transformers). Instead, Junk transformers that MEW received were scrapped for salvage. MEW and people working on a salvage basis for MEW scrapped Junk transformers on MEW's property.

74. Defendants did not retain ownership over transformers they sold to MEW as "Surplus" transformers. Instead, those transformers were generally used or resold by MEW, sometimes after necessary repairs were made, or scrapped if they were found to be unusable.

75. Some transformers Defendants sent to MEW, including some of those sent for repair, conveyed as "Junk," and sold as "Surplus," were leaking insulating oil at the time MEW took possession of them.

76. MEW opened each transformer sent to it for repair in order to evaluate repair needs. Upon opening a transformer, MEW would remove the internal components that had been submerged in the insulating oil and hang them above the tank. During this process, insulating oil containing PCBs routinely dripped or spilled on the floor or on bare ground.

77. MEW removed the insulating oil from each transformer that it repaired. Most of this oil was recycled via treatment through a medium known as Fuller's earth to remove acidity, while some was heated or otherwise filtered to remove moisture. Of the used oil that could not be recycled, most was intentionally dumped on the soil around the Site, while some was placed in barrels for later disposal.

78. After removing the insulating oil from the tank of a transformer sent for repair, MEW would generally clean the tank and other components using a solvent. It would then

routinely rinse the solvent off directly onto the floor or, when cleaning was conducted outside, the bare ground.

79. Upon completion of repairs, recycled oil was returned to the transformer along with new oil to make up for losses due to leaks, spills, drips, and the recycling process. MEW added new oil to nearly every transformer Defendants sent to it for repairs, other than those that required only exterior painting.

80. Filtration pads used to remove moisture from moisture-contaminated oil become contaminated with PCBs as a normal result of their use for decontaminating transformer oil that contains PCBs. MEW burned some used filtration pads outside at the Site.

81. Fuller's earth becomes contaminated with PCBs as a normal result of its use as a filtration medium for removing acidity from transformer oil that contains PCBs. MEW dumped used Fuller's earth on its property, where it and the PCBs it contained mixed with surface soils.

82. At some point during the 1960s, MEW stopped attempting to remove acidity from used transformer oil and instead disposed of acid-contaminated oil.

83. MEW scrapped motors, Junk transformers, and other electronics at its facility. Scrapping of electronic parts that contain insulated wiring, including motors and the copper windings within transformers, involves removal of that insulation, usually by burning the part in question. MEW routinely burned these parts on bare ground on its property to extract the valuable copper wiring. MEW routinely used transformer oil that could not be recycled to ignite or "jump start" these fires.

84. MEW scrapped most Junk transformers on its property on bare ground. Over the lifetime of MEW's operations, it scrapped thousands of transformers in these outdoor areas. As the first step in the process of scrapping a Junk transformer, MEW routinely dumped the

transformer oil it contained onto the bare ground. Some transformers, generally only those that were too large to conveniently tip over, were emptied via pumping transformer oil into barrels.

85. MEW's transformer repair and scrapping operations and refurbishment/resale operations resulted in releases of insulating oil containing PCBs around the Site.

86. When Defendants sent Junk transformers to MEW, they received credit on their account. The amount of credit a Defendant received for a given Junk transformer depended solely on its power and current rating, irrespective of other factors including date of manufacture, manufacturer, or condition.

87. When Defendants sold transformers, including those they or MEW referred to as "Surplus" transformers, to MEW, they received payment in cash. Some sales were accomplished by auction at which MEW submitted the winning bid for one or more transformers, while others were direct sales to MEW. Sale prices for transformers identical in terms of power and current ratings often differed, even within the same transaction.

88. The amount of credit Defendants received for each Junk transformer was generally a small fraction of the amount in cash they received for transformers they sold (including those they referred to as "Surplus" transformers) with identical power and current ratings built by the same manufacturer.

89. Defendants paid MEW for repairs on the basis of labor and materials required for each repair, irrespective of other factors including the manufacturer or power and current rating.

90. The amount of credit MEW provided for each Junk transformer was generally a small fraction of the amount MEW charged to repair similar transformers with identical power and current ratings.

91. Defendants expected and intended that used insulating oil would be removed from their transformers when it sent them to MEW for repair or scrapping/salvage. Defendants expected and intended that some amount of used insulating oil would be discarded from each transformer that it sent for repair or for refurbishment/resale. Defendants also expected and intended that some insulating oil from Junk transformers it sent to MEW would be discarded along with all other parts of such Junk transformers that could not be salvaged.

92. On information and belief, each Defendant sent transformers to MEW for repair, scrapping/salvage, or refurbishment/resale.

93. Defendants by contract, agreement, or otherwise, arranged for the disposal of hazardous substances, including PCBs, from the transformers they sent to MEW for repair, scrapping/salvage, and/or refurbishment/resale.

## CLAIMS FOR RELIEF

## COUNT I – ARRANGER LIABILITY

94. Paragraphs 1 through 92 are realleged and incorporated herein by reference.

95. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

96. Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

97. There have been releases, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and threatened releases, of hazardous substances, within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), at or from the Site.

98. The United States has incurred costs of response, within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), related to the releases or threatened releases of hazardous substances at the Site.

99. The United States' response actions at the Site are not inconsistent with the National Contingency Plan.

100. Each Defendant is liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), as a person who by contract, agreement, or otherwise, arranged for the disposal by other parties of hazardous substances that Defendant owned or possessed.

101. Pursuant to Section 107(a) of CERCLA, Defendants are jointly and severally liable to the United States for response costs incurred in connection with the Site.

PRAYER FOR RELIEF

102. Wherefore, the United States respectfully requests that this Court:

a. Enter judgment in favor of the United States, under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), holding each Defendant jointly and severally liable for all unreimbursed costs incurred by the United States in connection with the Site, including interest;

b. Enter a declaratory judgment of liability, under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against each Defendant that will be binding in any action to recover further response costs incurred by the United States in connection with the Site;

c. Award the United States its costs of this action; and

d. Grant such other and further relief as the Court deems appropriate.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C. 20530

03/11/2024
Dated

Eric Albert EA
Eric D. Albert
Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611
202-514-2800 (direct)
eric.albert@usdoj.gov